

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANDREW L. JOHNSON,                    )
                                      )
                Plaintiff,            )
                                      )
        v.                            )    No.  05 C 4213
                                      )
JO ANNE B. BARNHART,                  )
Commissioner of Social Security,      )
                                      )
                Defendant.            )

## MEMORANDUM OPINION AND ORDER

Andrew Johnson ("Johnson") seeks judicial review of the
final decision of Commissioner of Social Security Jo Anne
Barnhart ("Commissioner") denying both Johnson's current claim
for benefits and his request to reopen an earlier claim that had
challenged a prior termination of benefits.  Both sides have
moved for summary judgment under Fed. R. Civ. P. ("Rule") 56, and
Johnson has alternatively moved for a remand for further
proceedings.  For the reasons stated in this memorandum opinion
and order, both parties' Rule 56 motions are denied but Johnson's
alternative motion to remand is granted.

### Procedural Background[1]

Johnson first began receiving disability benefits, based on
a diagnosis of alcoholism, in October 1990 (R. 18).  Those

---

[1]  Because this opinion is based entirely on the record
(cited "R.--") that includes the evidence adduced during the
January 10, 2002 administrative hearing (the "Hearing"), the
Hearing testimony will later be recounted in the present (rather
than the past) tense.

payments were terminated in December 1996 due to new legislation
that precluded the awarding of benefits based on substance or
alcohol abuse (id.). Johnson appealed that termination, but he
pursued the matter no further after his appeal was denied on
July 14, 1998.

Instead, on June 28, 2000 Johnson filed a new application
for Social Security disability insurance benefits under 42
U.S.C. §§416(k) and 423,[2] alleging an onset of disability on
February 1, 1997 (R. 18-19, 51-53). After his application was
denied both initially and upon reconsideration, Johnson was
granted the Hearing before Administrative Law Judge ("ALJ")
Cynthia Bretthauer (R. 27, 32, 40, 43, 48-49). At the Hearing
Johnson was questioned both by the ALJ and his own attorney, but
no other witnesses were called (R. 18, 204-42). On January 14,
2002 (before the ALJ rendered her decision) Johnson explicitly
requested that in addition to granting his new application for
benefits, the ALJ should also reopen the July 1998 determination
that Johnson's original benefits had been properly terminated in
December 1996 (R. 18).

On February 22, 2002 ALJ Bretthauer issued her decision,
denying both Johnson's current claim for benefits and his request

---

[2] Further Title 42 references will take the form
"Section --." All 20 C.F.R. provisions are cited "Reg. §--" and
all Social Security rulings are cited "SSR --." Finally,
Johnson's legal memoranda are cited as "J. Mem. --" (for his
original) and "J. R. Mem. --" (for his reply).

2

to reopen his earlier claim (R. 18-24). Johnson then requested a review of that decision by the Appeals Council (R. 11-14). That request was denied on April 15, 2005, making the ALJ's decision the final decision by Commissioner (R. 4). Johnson then filed this action for review of that decision pursuant to Section 405(g).

## Factual Background

Johnson was born on January 7, 1948 (making him 49 at his February 1, 1997 onset date and 54 at the time of the Hearing), weighs 155 pounds and stands 5 feet 7-1/2 inches tall (R. 51, 61). Some years after completing nine years of general education he received a certificate in welding from a trade school (R. 68, 212-13).

Among other jobs, Johnson has worked as a "general laborer," a cab driver and a janitor, but he has not earned significant income since 1990, when he ceased working at his last job as a "housekeeper" due to a case of tuberculosis (R. 57, 63, 214-15).[3] Although he reapplied for that job in 1997, Johnson was told that he was "disabled" and was not rehired (R. 214).

Johnson acknowledges a history of alcohol abuse and multiple "driving under the influence" convictions over the years (R. 210-

---

[3] While Johnson's income records reveal that he actually did earn some income in 1991, that income was so minimal that, at least for purposes of calculating his eligibility for disability benefits, Commissioner considered his employment to have ended in 1990 (R. 56-57).

3

12, 223-25). Those convictions have not only lost him his
driver's license (which he has yet to recover) but also earned
him four months of incarceration in 2000 (R. 210-12, 223-25).
After participating in a rehabilitation program pursuant to the
most recent convictions, though, Johnson claims to have cut back
on his drinking (R. 223-25).

Johnson complains of a number of ailments and limitations.
First, he says that he has had trouble breathing, causing him to
have to rest frequently when walking or otherwise exerting
himself (R. 62, 168, 220, 221). In addition he states that his
ability to walk and stand has been further limited by pain,
swelling and aching in his feet and legs (R. 66, 86, 89, 168).
Johnson also claims to have experienced dizzy spells "two, three,
four times a month" due to high blood pressure, during which his
legs would "just [go] out" and he would have to sit down and rest
for an hour (R. 98, 168, 235-36). According to Johnson, those
spells would occur even when he took blood pressure medication
(R. 235). Furthermore, he complains of visual impairments due to
being blind in his right eye (R. 234).

Those ailments, Johnson claims, stem from a congeries of
underlying medical conditions and traumas that he has endured
over the years. Those include a stab wound to his lung (which he
claims resulted in the removal of that lung); a stab wound that
blinded his right eye; cellulitis, an ulcer and an abscess as

4

well as osteoporosis and osteomyelitis in his left foot,[4] which
ultimately required amputation of part of his left fifth toe; a
gunshot wound to his groin; high blood pressure and hypertension;
alcoholism; and a history of tuberculosis and pneumonia (J. Mem.
3-6; R. 62, 83, 107, 119, 154, 168, 226, 238).

As to the practical effects of that host of problems, while
Johnson acknowledges that he has been able to cook for himself,
do some cleaning, laundry, ironing and even go shopping two times
a month, he also says that his girlfriend or sister help him out
with his chores twice a month, that he occasionally hires someone
to mop the floors and that in general he can perform chores on
his own only insofar as they do not require him to stand "for any
length of time" (R. 92, 222). Indeed, he asserts that at least
at one point his limitations reduced him to crawling to his stove
to cook his meals (R. 222).

Johnson further states that he leaves his home only two or
three times a week, either getting a ride or taking a bus, and
that his recreational activities include visiting neighbors,
going to Alcoholics Anonymous meetings, going to church, playing
cards and going out to eat two or three times a month (R. 93-94).
As to his specific functional capacities, Johnson's estimates of

---

[4] Osteoporosis is a "[r]eduction in the quantity of bone or
atrophy of skeletal tissue" (Stedman's Medical Dictionary
["Stedman's"] 1285 (27th ed. 2000)). Osteomyelitis is an
"[i]nflammation of the bone marrow and adjacent bone" (id. at
1284).

5

how far he could walk without rest range from one-half block (R. 88) to three blocks (R. 62, 220), while his estimates of how long he could stand range from "5 to 10 minutes" (R. 88) to two to three hours (R. 221). In addition Johnson claims that he could lift 15 to 20 pounds, but he "couldn't walk that far" with such a load (R. 238).

Johnson contends that the existence of those underlying conditions and limitations is supported by the record medical evidence, which includes records from the treatment of his left foot (R. 119-167), records from two consulting examinations (R. 168-72) and the reports of two medical consultants as to his mental and physical Residual Functional Capacity ("RFC") (R. 173-98).[5] First, on October 13, 1997 Johnson was seen at Saint Therese Medical Center, complaining of leg swelling and pain in his "left lower extremity" following a bicycle accident three weeks earlier (R. 119). Johnson was initially found to be suffering from a number of problems, including osteoporosis and cellulitis with an ulcer and abscess in his left foot, as well as an apparently unrelated abscess in his neck and hypertension (R.

---

[5] Although ALJ Bretthauer noted that she had repeatedly asked Johnson and his counsel to provide further medical records from the relevant time period (R. 39, 241), they were evidently unable to do so. Nor was Commissioner successful in her attempt to procure records from a Dr. Glosson, a physician who seems, from Johnson's materials and testimony, to have been a treating physician during the relevant time period (and the only such physician that Johnson was able to name)(R. 109-12, 216).

6

119-20, 128). Johnson was then operated on for both the foot and neck infections (R. 128-29). When a follow-up examination confirmed osteomyelitis in his left foot, further surgery was performed on November 19, 1997 to amputate part of Johnson's left fifth toe (R. 154).

On August 22, 2000 Dr. Karen Leone conducted a 40-minute consultative exam of Johnson (R. 168-70). Dr. Leone found his medical history to include, among other things, a gunshot wound to his groin, a stab wound to his lungs, alcoholism and bouts of tuberculosis and pneumonia (R. 169-70). Dr. Leone also reported that Johnson was presently blind in his right eye, had dyspnea[6] "on exertion" and suffered from hypertension, although he "[wa]s not taking the medication that was prescribed by doctors" for that condition (R. 170).[7]  Dr. Robert Baker performed a second consultative exam on October 9, 2000, diagnosing Johnson with "Alcohol Dependence...[H]ypertension, Right Eye Blindness, History of [Tuberculosis], [and] Abscess" (R. 171-72).

---

[6] Dyspnea is "[s]hortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude" (Stedman's at 556).

[7] Johnson's suggestion that Dr. Leone found him to have dyspnea particularly "with walking half a block or if he bends over" (J. Mem. 14) is, as the government states, erroneously based on Dr. Leone's recitation of Johnson's reported ailments, rather than Dr. Leone's own medical findings (R. 168, 170).  Nor does Dr. Leone describe Johnson's dyspnea as "severe," as Johnson also suggests (J. Mem. 16).

7

Following examinations, non-examining consultants Carl Hermameyer, Ph.D. ("Hermameyer") and Dr. Harry Bergmann assessed Johnson's RFC (R. 173-198). Hermameyer, addressing Johnson's mental RFC, found him to suffer from a "substance addiction disorder" that caused mild limitations on Johnson's "activities of daily living," his "social functioning" and his "ability to maintain concentration, persistence or pace" (R. 181, 183) and caused moderate limitations on his ability to understand, remember and carry out detailed instructions (R. 187-89). Dr. Bergmann, addressing Johnson's physical limitations, found that he could lift and/or carry 50 pounds occasionally and 25 pounds frequently, could sit, stand and/or walk for six hours each in an eight-hour workday and had no limitations, other than those found for lifting and/or carrying, in his ability to push and/or pull (R. 192). Dr. Bergmann also found that due to Johnson's visual problems and "foot pain and numbness" he could not climb ladders, ropes or scaffolds or work "around hazardous machinery [or] heights" (R. 193-95).

After reviewing the submitted evidence, the ALJ found Johnson's claims of blindness in his right eye, hypertension and alcoholism to be supported by the record (R. 20-21). But she appeared to find no such support for Johnson's claims of lung damage (or, in particular, that a lung had been removed), and she made no mention at all of his claimed history of pneumonia and

tuberculosis or his gunshot wound (R. 20-21). In addition the
ALJ determined that Johnson's injury to his left foot occurred
after his eligibility for disability benefits had expired, so
that it could not properly be considered in determining his
disability status (R. 20).

Nor did ALJ Bretthauer find Johnson's claims to be credible
as to the severity of his ailments and limitations (R. 21). She
based that adverse determination not only on a lack of support
for Johnson's claims in the objective medical evidence but also
on (1) his failure to take prescribed medicines or to seek
treatment regularly, (2) his observed ability to walk without an
assistive device during the Hearing, (3) his testimony that he
attempted to return to work during the relevant time period and
(4) his description of daily living activities, which the ALJ
found not to be "limited to the extent one would expect, given
the complaints of disabling symptoms and limitations" (R. 21-22).

Based on those assessments the ALJ, largely echoing Dr.
Bergmann's RFC opinion, found that Johnson's impairments
precluded him only from "lifting more than 50 pounds occasionally
or more than 25 pounds frequently; climbing ropes, ladders, or
scaffolds," from "concentrated exposure to performing work around
unprotected heights" and from "perform[ing] work requiring good,
binocular vision" (R. 20). Ultimately, because the "exertional
and nonexertional requirements" of Johnson's past work as a

9

janitor and housekeeper could be met despite those impairments, the ALJ determined that Johnson "retain[ed] the capacity to perform 'past relevant work,'" and he was therefore not disabled (R. 22).

## Standard of Review

Judicial review of decisions by Commissioner, as authorized by Section 405(g), is limited to determining (1) whether Commissioner applied the correct legal standards in reaching the decision and (2) whether there is substantial evidence in the record to support the findings (Rice v. Barnhart, 384 F.3d 363, 368-69 (7th Cir. 2004)). Substantial evidence means "no more than such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" (Kepple v. Massanari, 268 F.3d 513, 516 (7th Cir. 2001), quoting--as always in these cases-- Richardson v. Perales, 402 U.S. 389, 401 (1971)). In that respect this Court must look at the entire administrative record, but it "do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner" (Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000)). That does not call, however, for an uncritical rubber-stamping of Commissioner's decision (id.).

## Refusal To Reopen Prior Claim

Johnson's first objection, challenging the ALJ's refusal to reopen his earlier claim, can be disposed of easily. While

Johnson provides a lengthy discussion of when and under what circumstances a prior claim can and should be reopened, his efforts are for naught, for this Court lacks jurisdiction to review a refusal to reopen (Johnson v. Sullivan, 936 F.2d 974, 976 (7th 1991)). Although Section 405(g) does provide for judicial review of "any final decision of the Commissioner," such cases as Bolden for Bolden v. Bowen, 868 F.2d 916, 918-19 (7th Cir. 1989) teach that a refusal to reopen an earlier proceeding does not qualify as such a decision, so that review is unavailable.

## Denial of Current Claim

Johnson's objections to the denial of his current claim for benefits cannot be so readily dismissed. To be eligible for those benefits, Johnson must meet two criteria, which will be addressed here successively.

First Johnson must of course demonstrate that he suffers from a "disability," defined in pertinent part as (Section 423(d)(1)(A)):

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

In that respect Reg. §404.1520(a)(4) prescribes a sequential five-step test that asks whether (Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 351-52 (7th Cir. 2005)):

11

(1) the claimant is presently employed; (2) the
claimant has a severe impairment or combination of
impairments; (3) the claimant's impairment meets or
equals any impairment listed in the regulations as
being so severe as to preclude substantial gainful
activity; (4) the claimant's residual functional
capacity leaves him unable to perform his past relevant
work; and (5) the claimant is unable to perform any
other work existing in significant numbers in the
national economy.

For all but the fifth step of that test the claimant bears the

burden of proof, and an affirmative answer at either step 3 or

step 5 results in a finding of disability (id. at 352).

    In addition to showing a disability Johnson must also prove

that it existed while he still had "insured status" (SSR 83-20;

Stevenson v. Chater, 105 F.3d 1151, 1152 (7th Cir. 1997)).

Calculation of the date upon which a claimant's disability

insured status expires--his "date last insured"--depends upon the

number of calendar quarters in which the claimant has earned a

minimum amount of income, referred to as "quarters of coverage"

(Reg. §§404.130, 404.140, 404.143). In Johnson's case, to be

insured in a given quarter he must have had at least 20 quarters

of coverage during the 40-quarter period ended with that quarter

(Reg. §404.130(b)).[8]

    Here Johnson objects first to the ALJ's calculation of his

_____

[8] Johnson does not meet the criteria of any of the three
other ways to qualify for disability insured status set out in
Reg. §404.130(c) to (e)--he was well over 31 years old throughout
the relevant time period, he has not demonstrated a prior period
of disability before age 31 and he has not demonstrated that he
is legally blind under Reg. §404.1581.

12

date last insured, arguing that rather than expiring on June 30, 1997, his insured status lasted until June 2000 "at the very least" (J. Mem. 12) and that the ALJ therefore erred in failing to consider ailments and limitations that arose between those dates. In addition, while Johnson offers no objection to the ALJ's findings at steps 1 to 3 of the disability test, he does find fault with her step 4 finding that he was capable of performing his past work. In particular Johnson argues that the ALJ erred both in her preliminary assessment of his RFC and in her ultimate conclusion that the RFC allowed him to meet the demands of his past work. As discussed below, while this Court finds no error in the ALJ's calculation of Johnson's date last insured, she did err both in her RFC assessment and in the course of her determination that Johnson could do his past work, so that this case must be remanded for further consideration.

Date Last Insured

In deciding whether a claimant has the necessary 20 quarters of coverage in a 40-quarter period, an ALJ must not count (with some exceptions not applicable here) any quarters in which the claimant was disabled as part of the group of 20 or as part of the group of 40 (Reg. §140.130(f)). Although Johnson correctly invokes the just-cited regulation, he appears to have misapplied it. If 40 quarters are counted back from Johnson's asserted date last insured of June 2000--skipping over Johnson's 24 quarters of

13

disability between 1991 and 1996--the period reaches back to June 1984. But according to Commissioner's records, Johnson had only 14 quarters of coverage between June 1984 and June 2000, six shy of the required 20 (R. 56-57). Hence Johnson did not have disability insured status through June 2000.

Instead of that misapplication, a proper calculation of Johnson's insured status begins by counting back to the date of his 20th most recent covered quarter, which in this case was the third quarter of 1981 (R. 56-57). Johnson's date last insured is then determined by counting forward 40 quarters--again skipping any quarter in part or all of which Johnson was disabled (Reg. §404.130(f)). In this instance that count arrives at the second quarter of 1997. In other words, Johnson's insured status ended, as Commissioner calculated, on June 30, 1997 (the last day of the second quarter of that year).[9]

RFC Determination

Reg. §404.1545(a) to (d) identify a claimant's RFC as "the most [the claimant] can still do despite [his] limitations," expressed in terms of the claimant's ability to meet a variety of "physical, mental, sensory and other requirements of work." In that respect an ALJ must follow a two-step process (Scheck v. Barnhart, 357 F.3d 697, 701 (7th Cir. 2004)). First "the ALJ

---

[9] ALJ Bretthauer's reference to "June 31, 1997" (R. 20) was of course a typographical error.

14

must consider whether there is an underlying 'determinable physical or mental impairment that could reasonably be expected to produce the [complained-of] symptoms'" (id., quoting SSR 96-7p). Once satisfied that such an impairment or impairments exist, "the ALJ must further evaluate the 'intensity, persistence, and functionally limiting effects of the symptoms'" (Scheck, 357 F.3d at 701), an analysis that inherently involves "an assessment of the Claimant's credibility" (id. (citations omitted)).

While an ALJ need not address every piece of evidence in the record, she does need to provide a "minimum articulation" of her rationale so as to allow for "meaningful review" (Walker v. Bowen, 834 F.2d 635, 643 (7th Cir. 1987)), "build[ing] an accurate and logical bridge from the evidence to [her] conclusion" (Clifford, 227 F.3d at 872). In this case Johnson challenges both (1) ALJ Bretthauer's determination of his underlying impairments and (2) her assessment of his claims as to the severity and limiting effects of those underlying impairments.

1. Underlying Impairments

While the ALJ found that Johnson suffered from blindness in his right eye, alcoholism and hypertension, Johnson argues that she either improperly dismissed or simply did not address other underlying conditions that would support his claims of functional

15

limitations. As the ensuing discussion reflects, an analysis of those contentions produces mixed results.

For example, Johnson objects repeatedly to the ALJ's refusal to consider his problems with his left foot, which comprised an ulcer and abscess as well as osteomyelitis and osteoporosis, and which culminated in the amputation of part of his fifth toe. While such an array of ailments could well have affected Johnson's ability to walk or stand, the record contains strong support for the ALJ's finding that those problems arose only after June 30, 1997, so that they were properly excluded from the RFC assessment.

As stated earlier, when Johnson first sought medical attention for his foot issues on October 13, 1997, he reported that his injuries were due to a bicycle accident that had occurred three weeks earlier--sometime in late September (R. 119). Although Johnson sought to expand that time frame at the Hearing, even then he testified that his foot started to hurt him only two to three months before he went to the hospital (mid-July at the earliest), that the foot ailments were attributable to a bicycle accident and that he had no problems with his foot before that accident (R. 217, 225-28).[10] On that record this Court

_____

[10] Nor did the ALJ need to seek further medical consultation as to whether the "cortical destruction" in Johnson's foot might have begun before his date last insured, as Johnson argues (J. R. Mem. 2-4). Even if that "destruction" had begun while Johnson still had disability insured status, it would

16

cannot disturb the ALJ's finding that Johnson's foot ailments arose after his date last insured, so that they should not be considered in determining his RFC.[11]

That cannot be said, however, as to the ALJ's treatment of several of Johnson's other claimed impairments. Even though an ALJ need not discuss every piece of evidence in the record, she may not simply ignore medical evidence at odds with her ruling (Golembiewski v. Barnhart, 322 F.3d 912, 917-18 (7th Cir. 2003)(per curiam)). On the contrary, "all medical evidence that is credible, supported by clinical findings, and relevant to the question at hand should be considered and discussed by the ALJ" (Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984)). Nor may an ALJ "play doctor" and "substitute [her] own judgment for a

_____

not then have been a functional limitation, given his testimony that he had no foot problems before his accident. Any such pre-existing but non-limiting condition would have been irrelevant to an assessment of Johnson's RFC.

[11]   Observing that the outer edge of that two to three month estimate would put the onset of his foot problems "at the doorstep" of his date last insured (J. R. Mem. 4), Johnson suggests that the ALJ's assessment of that date of onset was too rigid, especially given his difficulties with "coherency, understanding, concentration and with answering questions" (id.). But taken as a whole, the record supports the ALJ's finding. Not only did Johnson initially report the date as being only three weeks before his hospital visit (a particularly probative estimate in view of its temporal proximity to the events), but even when he later expanded that estimate, Johnson refused to push beyond that two to three month time frame, despite repeated questioning by both his attorney and the ALJ--and even despite a cautionary reminder from his attorney that sticking to that time frame would not "bring [him] back to June" (R. 228).

17

physician's opinion without relying on other medical evidence or authority in the record" (Clifford, 227 F.3d at 870).

Here the record includes statements by two examining physicians: Dr. Leone's report that Johnson had "dyspnea on exertion with a history of tuberculosis and pneumonia and stab wound to the lungs," Dr. Baker's diagnosis of a "history of [tuberculosis]" (R. 170, 172) and Dr. Leone's notation under "Past Medical & Surgical History" that Johnson had undergone surgery for a gunshot wound to his groin (R. 169). In addition, the "Nursing Evaluation" contained in the records from Johnson's visit to St. Therese's Medical Center also observed that Johnson's "Current or Past Medical Conditions" included a stab wound to the lung, a gunshot wound and tuberculosis (R. 135-36). To be sure, the portions of such statements found in a patient's medical history always reflect the patient's self-reporting--but the professionals involved reported nothing to contraindicate those matters, nor did any other medical evidence in the record refute those notations.

Nevertheless the ALJ's report made no reference to Dr. Leone's dyspnea finding or to Johnson's reported history of tuberculosis, pneumonia and a gunshot wound. Similarly, although the ALJ does affirmatively--and justifiably--reject Johnson's claim that his lung was removed (in the absence of objective medical evidence of any such removal (R. 21), she did not mention

the lung <u>wound</u> to which Dr. Leone refers.

Clearly those matters could well have played a role in Johnson's claimed difficulties in breathing, standing and walking. Equally clearly, given the combination of (1) the ALJ's failure even to mention most of those matters and (2) her ultimate conclusion that Johnson had only a single exertional limitation--an inability to lift more than 50 pounds occasionally or more than 25 pounds frequently (R. 20)--it is plain that the ALJ either rejected those underlying conditions completely or at least discounted their effect on Johnson's functional capabilities. Yet she offered no explanation for any such rejection or discounting.

Especially in a case such as this, where the ALJ's findings appear to cut not only against "a line" of record medical evidence but actually against the <u>only</u> medical evidence that speaks to those impairments, the ALJ has a duty to articulate her reasoning to permit meaningful review (see, e.g., <u>Golembiewski</u>, 322 F.3d at 917 and <u>Wilder v. Chater</u>, 64 F.3d 335, 337 (7th Cir. 1995)). ALJ Bretthauer failed to fulfill that duty.

2. <u>Credibility Determination</u>

Johnson also objects to ALJ Bretthauer's determination of the extent of his functional limitations springing from his impairments. Johnson contends in particular that the ALJ relied on improper grounds in discrediting his claims of limitation.

Usually a reviewing court grants considerable deference to an ALJ's credibility determination (Clifford, 227 F.3d at 872). But when such a determination rests "on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor]," a reviewing court has "greater freedom to review the ALJ's decision" (id., quoting Herron v. Shalala, 19 F.3d 329, 335 (7th Cir. 1994)). Here several errors infect the ALJ's credibility determination.

To begin with an objection that is not well-taken, however, Johnson contends that the ALJ improperly discredited the claimed severity of his limitations only because that severity was not supported by objective medical evidence. While Johnson rightly states that sole reliance on the absence of medical evidence would be improper (see Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004)), the ALJ's refusal to accept Johnson's claims fully was not premised only on a lack of supporting medical evidence (although under SSR 96-7p that was properly one factor the ALJ considered). Instead the ALJ pointed to several other factors--including Johnson's failure to seek and follow treatment, his activity level at the Hearing, his testimony concerning his daily activities and his attempt to go back to his old job--in justifying her credibility finding (R. 21-22). While later discussion concludes that the ALJ applied many of those factors improperly, that hardly supports a claim that she failed

to consider them at all.[12]

Next Johnson contends that the ALJ erred in relying on his
alleged failure to take prescribed medicines and to seek regular
treatment. Generally speaking, such failures can certainly imply
that a claimant's symptoms are not as debilitating as he claims
(SSR 96-7p; see, e.g., Sienkiewicz v. Barnhart, 409 F.3d 798, 804
(7th Cir. 2005)(per curiam)). But there are of course other
possible explanations for such failures. For example, a claimant
may lack the necessary financial resources to seek or pursue
treatment, may find the side effects of a prescribed treatment
less tolerable than the condition it is meant to alleviate, may
find the treatment contrary to his religious beliefs or may
simply find the treatment unavailing. Recognizing such
possibilities, SSR 96-7p provides:

   However, the adjudicator must not draw any inferences about
   an individual's symptoms and their functional effects from a
   failure to seek or pursue regular medical treatment without
   first considering any explanations that the individual may
   provide, or other information in the case record, that may
   explain infrequent or irregular medical visits or failure to
   seek medical treatment. The adjudicator may need to
   recontact the individual or question the individual at the
   administrative proceeding in order to determine whether
   there are good reasons the individual does not seek medical
   treatment or does not pursue treatment in a consistent
   manner.

Here the ALJ did identify potentially legitimate grounds for

--------

[12] Indeed, Johnson's specific objections to the ALJ's
application of several of those factors makes his claim that she
didn't consider them at all difficult to fathom.

21

discrediting Johnson's claimed limitations: She noted both that Johnson "had gone for relatively long periods of time without bothering to refill prescribed medications"--pointing particularly to Dr. Leone's comment that Johnson told her he "ran out of [hypertension] pills some time ago"--and that the "record reveals relatively infrequent trips to the doctor," either for his hypertension or for any of his other "allegedly disabling symptoms" (R. 21, 168). But what the ALJ did not do was to adhere to SSR 96-7p's directive that she inquire into alternative justifications for Johnson's failure to seek or pursue treatment.

At least two such potential explanations emerge from the record. For one thing, as Johnson observes, the background of the case--particularly the fact that he had not earned significant income since 1990 and had been denied disability benefits since 1996--clearly raised the possibility that he lacked the financial resources to seek more frequent treatment or to pursue prescribed treatments fully. Yet the ALJ made no inquiry into the effect Johnson's financial situation might have had on his treatment history. In addition, and independently of that possibility, even though Johnson's Hearing testimony was that his hypertension medicines did not actually alleviate his symptoms (R. 235-36), that potential explanation was also left unexplored by the ALJ.

Indeed, the ALJ never really confirmed that Johnson was in

fact failing to take his hypertension medications during the
relevant pre-June 30, 1997 time period. Instead she simply seems
to have inferred from Dr. Leone's notation that because Johnson
was not taking his prescribed medications when the doctor
examined him, Johnson must also not have been taking them before
June 30, 1997--over three years earlier (R. 21, 168).[13] In
summary, even if it might be said that substantial evidence
suggested Johnson's failure to seek or pursue treatment, the
ALJ's own failure to investigate potential explanations for that
conduct precluded the dismissal of Johnson's claimed limitations
on that basis (see Thompson v. Sullivan, 987 F.2d 1482, 1490
(10th Cir. 1993)).

Johnson also challenges the ALJ's finding that his reported
daily activities contradicted (or at least undermined) his claims
of functional limitation. In particular the ALJ noted that
Johnson "cook[ed] his own meals," that he was "able to...iron and
do laundry twice a month" and that he "play[ed] cards, [went] to

---

[13] ALJ Bretthauer's related finding that Johnson was not
seeking regular treatment is dubious, based as it is not on any
specific evidence of such failure but rather on her statement
that "the record reveals relatively infrequent trips to the
doctor" (R. 21). While Johnson has admittedly submitted few
records as to his treatment history, the absence of documentation
on that score is hardly compelling evidence. In fact, the one
piece of evidence that actually speaks directly to the question
is Johnson's own testimony at the Hearing, in which he said that
he was seeing doctors on a regular basis (R. 216).

23

church weekly, and out to eat 2-3 times a month" (R. 22).[14] But
our Court of Appeals has frequently observed that the mere
ability to carry on sporadic minimal daily activities does not
necessarily indicate that a claimant is not disabled (see, e.g.,
Carradine v. Barnhart, 360 F.3d 751, 755-56 (7th Cir. 2004);
Clifford, 227 F.3d at 872). Here Johnson's ability to do a
handful of household chores--an ability that he specifically
states is limited to things he can do without having to stand for
any length of time and that is supplemented with aid from others
(R. 92, 222)--or the facts that he plays cards, goes to church or
eats out a few times a month scarcely "contradicts" his claimed
limitations on walking, lifting, carrying and standing.

It may be observed parenthetically that the ALJ appears to
have made too much of Johnson's having walked to the bathroom
twice during the Hearing. ALJs may of course consider their own
observations in making credibility determinations (SSR 96-7p),
and here the observation could well discredit a claim that
Johnson could not walk at all without such an "assistive device"
(R. 21).[15] But to find further, as the ALJ did, that those

_____

[14] Although the ALJ also listed "vacuuming," Johnson's
"Activities of Daily Living Questionnaire"--the cited source for
his list of activities--actually indicates that he did not vacuum
(R. 22, 92).

[15] Any broader discrediting of the stated need for an
assistive device would have to be tempered by the short distance
involved in a trip to the bathroom.

24

visits to the bathroom also undermined Johnson's claim that his "legs give out" (R. 21-22)--certainly not a claim that they "give out" every moment of the day--is an unwarranted extrapolation from what was at best a limited snapshot of Johnson's functional abilities.

Finally, Johnson complains of the ALJ's reliance on his attempt to get back his old job as a janitor. In that regard the ALJ viewed that attempt as showing Johnson's belief that his claimed limitations would not then prevent him from performing his past work, a belief that would undermine his current claims to the contrary (R. 22).[16] Johnson responds that the record reflects that he applied for the job not because he necessarily felt he could perform its required duties, but rather because he needed the income and other perks the job would afford him.

Admittedly Johnson's later description of his attempt could be read to suggest that it was made more out of economic necessity than any actual belief in his ability to perform the required duties (R. 213-14). But the scope of this Court's review is significantly curtailed when the issue is one of subjective considerations, such as the nuances of live testimony.

---

[16] It should be emphasized, though, that this point speaks only to what Johnson believed about his abilities and how that might undermine Johnson's general credibility. Because the question is whether Johnson had the ability and not whether he thought so, the fact that his prospective employer found he was not able to do the job surely has more probative force (R. 214).

So while Johnson's argument is certainly plausible, it cannot be said that the ALJ's adverse reading was not supported by substantial evidence (see Delgado v. Bowen, 782 F.2d 79, 83 (7th Cir. 1986)(per curiam).

## Johnson's Ability To Perform Past Work

Johnson also takes issue with the ALJ's ultimate conclusion, based on her challenged RFC determination, that he "retain[ed the capacity to perform 'past relevant work'" as a janitor or in housekeeping and was therefore not disabled (R. 22). To that end an ALJ must compare a claimant's present capacities with the requirements of his past occupations (Strittmatter v. Schweiker, 729 F.2d 507, 509 (7th Cir. 1984)). That comparison must consider not only the duties of the specific jobs the claimant actually held but also the duties of those jobs "as generally required by employers throughout the national economy" (Orlando v. Heckler, 776 F.2d 209, 215 (7th Cir. 1985), quoting SSR 82-61). Nor can an ALJ simply rely on broad categorical assessments of what the claimant can still do or of a past occupation's requirements (Strittmatter, 729 F.2d at 509). Instead "the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks" (Nolen v. Sullivan, 939 F.2d 516, 518 (7th Cir. 1991)).

ALJ Bretthauer's report plainly fails to meet those

standards. After correctly stating that Johnson's past relevant
work included "a job as a janitor and in housekeeping," she
offers only a single sentence that concludes summarily that "the
exertional and nonexertional requirements of that job are
consistent with the claimant's residual functional capacity as
determined in this decision, and, therefore, the claimant retains
the capacity to perform 'past relevant work'" (R. 22). While the
ALJ does set out Johnson's capacities in adequate detail
elsewhere in her report,[17] she nowhere discusses what she found
to be the actual duties and demands of his past jobs. Indeed,
the report does not even make clear which of the two past jobs
the ALJ found Johnson capable of performing (one or both), or
whether she was considering the duties of those jobs as Johnson
had actually performed them rather than as performed in the
economy in general. In short, the ALJ again failed to articulate
her reasoning even minimally, leaving this Court unable to
perform a meaningful review of her findings.

---

[17] Johnson complains that the ALJ failed to offer a
"function-by-function" analysis of his limitations, as required
by SSR 96-8p (J. Mem. 13). That criticism is unwarranted. While
the ALJ did not spell out Johnson's limitations individually as
to each of the myriad activities listed in Reg. §404.1545(b) to
(d), her report hardly leaves unclear the extent to which
Johnson's abilities in those other areas are curtailed: It
listed the activities that the ALJ found to be limited, with the
clear implication that Johnson's ability to engage in the
unlisted activities was unlimited (R. 20).

## Instructions on Remand

In light of the errors identified in this opinion, this case must be remanded so that Commissioner can reconsider both (1) her determination of Johnson's RFC and (2) whether the RFC would allow Johnson to perform his past work. This remand does not of course direct the outcome of that reconsideration. It rather requires that the outcome be properly justified and that the justification be properly articulated.

It should also be made clear that this remand does not contemplate the submission of new evidence. Although this Court does have the power to order such a remand under sentence six of Section 405(g), Johnson has neither sought such a remand nor has he demonstrated that "there is new evidence which is material and that there is good cause for failure to incorporate such evidence into the record in a prior proceeding," as a sentence six remand requires. Instead this remand is ordered pursuant to sentence four of Section 405(g). That, while allowing further factfinding, is "an entirely different kind of remand" than that involving new material evidence (and unlike a sentence six remand, constitutes a final, appealable judgment--see <u>Melkonyan</u> <u>v. Sullivan</u>, 501 U.S. 89, 98-102 (1991)).

## Conclusion

It is obvious that the presence of factual issues precludes granting either party's Rule 56 motion. This case is instead

remanded to Commissioner for a reconsideration, consistent with this opinion, of both Johnson's RFC and whether that RFC would have allowed Johnson to perform any past relevant work.

_____
Milton I. Shadur
Senior United States District Judge

Date: June 16, 2006